**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE CONDUENT BUSINESS SERVICES DATA BREACH LITIGATION | Civil Action No. 2:25-cv-16953 (MEF) (ADS) |

**JOINT DECLARATION OF CLASS COUNSEL IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

We, James E. Cecchi, Jeff Ostrow, Norman E. Siegel, and Gary M. Klinger, Class Counsel[1] in the above-captioned Action hereby declare as follows:

1. We submit this joint declaration pursuant to Rule 23(e), in support of Plaintiffs' Motion for Preliminary Approval. As is explained in detail below, it is Class Counsel's considered judgment that the Court should grant Preliminary Approval and direct Notice to the Settlement Class as the proposed Settlement is fair, reasonable and adequate, and the Court will ultimately be able to certify the proposal for Final Approval.

2. Class Counsel making this declaration are nationally recognized class action lawyers who practice in a variety of disciplines including data privacy. The law firm resumes of Carrella, Byrne, Cecchi, Brody & Agnello P.C., Kopelowitz

[1] All capitalized terms herein shall have the same meanings as those defined in Section II of the Settlement Agreement, attached to the Motion for Preliminary Approval as *Exhibit A*.

Ostrow P.A., Milberg PLLC, and Stueve Siegel Hanson LLP were submitted to the Court when Class Counsel were appointed to their interim leadership positions. ECF Nos. 29-1–29-4. Class Counsel have collectively prosecuted and settled hundreds of data breach and privacy cases including some of the largest and most complex since the first data breach cases were filed and litigated over 10 years ago. Class Counsel are, as such, eminently qualified to opine on the appropriateness of the Settlement. The proposed Settlement is fair reasonable, and adequate particularly considering: (1) Conduent's business and financial condition and inability to pay more; and (2) the substantive difficulties and inherent risks of prosecuting the Action against Conduent and Conduent Defendant Clients.

## I. INTRODUCTION

3. The Settlement includes both monetary and non-monetary relief. The monetary relief consists of Conduent's agreement to pay $80,000,000.00 in cash into a non-reversionary Settlement Fund. The non-monetary relief includes ongoing security enhancements and commitments related to HIPAA Security Rule (45 C.F.R. Part 160 and Subparts A and C of Part 164). In exchange, Settlement Class Members will give Conduent, Conduent's clients, and other individuals and entities as detailed in the Release section of the Settlement Agreement a narrowly tailored release of claims resulting from, arising out of, based upon, or related to the Data Incident and notifications related to the Data Incident.

4. The Settlement Class consists of approximately 62 million individuals residing in the United States who are on the Class List and were provided actual or substitute notice by Conduent and/or Conduent's clients that their Private Information may have been affected by the Data Incident. The Settlement Class is separated into two subclasses: (a) Subclass A containing approximately 40 million individuals whose Private Information was exfiltrated during the Data Incident, but the information was stored in complex backup files such that the data was not readily accessible by third parties; and (b) Subclass B containing of approximately 22 million Settlement Class Members whose Private Information was exfiltrated during the Data Incident and whose information was stored in files wherein the data was more readily accessible to third parties.

5. The Settlement Class Member Benefits include both Monitoring and Cash Payments. All Settlement Class Members will automatically, without having to file a Claim, receive either one year of Credit Monitoring or one year of Medical Data Monitoring. Monitoring will be provided by CyEx, Inc., a well-established credit and medical data monitoring provider. Specifically, Subclass A Settlement Class Members will receive Credit Monitoring (CyEx Financial Shield Complete), and Subclass B Settlement Class Members will receive Medical Data Monitoring (CyEx Medical Shield Complete). The Monitoring includes a number of beneficial features, including dark web monitoring and $1,000,000.00 in identity-theft

insurance with no deductible.

6. All Settlement Class Members may elect to receive a Cash Payment for Documented Losses which includes a cash reimbursement of up to $3,500.00 for all Settlement Class Members who have documented, unreimbursed out-of-pocket losses related to fraud and/or identity theft stemming from the Data Incident. Additionally, Subclass B Settlement Class Members may elect to receive a Pro Rata Cash Payment, which is a pro rata cash payment out of the Net Settlement Fund. Those Subclass B Settlement Class Members who resided in California on October 21, 2024, will be entitled to an upward adjustment called the California Statutory Payment of 20% in the amount of the Pro Rata Cash Payment.

7. The Settlement Agreement also codifies Conduent's commitment to ongoing security enhancements. Defendant has provided a confidential declaration to Class Counsel detailing those actions.

8. All of the Parties' agreements are in the Settlement Agreement.

9. The Settlement was reached following significant effort, including thorough investigation, extensive informal discovery, consultation with multiple experts, confirmatory discovery into Conduent's financial condition, and a full-day, arm's-length mediation before an experienced class action mediator.

## II. BACKGROUND OF THE ACTION

### A. Summary of the Class Claims

10. Conduent is a technology-enabled business process services and outsourcing company that manages high-volume, digital processing operations for businesses and governmental agencies.

11. This Action arises from a cyberattack on Conduent's network, which began on or about October 21, 2024, and continued until approximately January 13, 2025. During that time, an unauthorized third party accessed Conduent's systems and exfiltrated data files containing Private Information entrusted to Conduent by Conduent's clients.

12. This type of data security case is often referred to as a hub-and-spoke data breach in the sense that Conduent (the hub) suffered the Data Incident while in possession of Private Information provided to Conduent by Conduent's clients (the spokes). A hub-and-spoke case presents challenges different from, and more complex than, a straightforward case against a single defendant which was impacted by a security incident.

13. Plaintiffs allege the threat actor, known as SafePay, exfiltrated approximately 8.5 terabytes of data from Conduent's network, including the Private Information of approximately 62 million individuals. Plaintiffs further allege Conduent failed to implement reasonable cybersecurity measures to protect that

Private Information and failed to provide timely notice of the Data Incident. They also allege the Conduent Defendant Clients (Conduent clients whose insureds' data was entrusted to Conduent) failed in their oversight and contractual obligations to ensure that their business associate (Conduent) safeguarded that information consistent with state and federal law. *See generally* ECF No. 157.

14. The operative Amended Consolidated Class Action Complaint (ECF No. 157) includes 16 causes of action against Conduent and the Conduent Defendant Clients: negligence against Conduent and Conduent Defendant Clients (Counts I-II); negligence *per se* against Conduent and Conduent Defendant Clients (Counts III-IV); breach of implied contract against Conduent Defendant Clients (Count V); breach of third-party-beneficiary contract against Conduent (Count VI); unjust enrichment against Conduent and Conduent Defendant Clients (Counts VII-VIII); declaratory and injunctive relief against Conduent and Conduent Defendant Clients (Count IX); violation of the California Consumer Privacy Act, California Confidentiality of Medical Information Act, and California Customer Records Act by Conduent, Elevance Health, Inc., and Health Care Services Corporation ("HCSC") (Counts X-XIII); violation of the Illinois Consumer Fraud and Deceptive Business Practices Act by Conduent and HCSC (Count XIV); violation of the Massachusetts Consumer Protection Act, Chapter 93A, by Conduent (Count XV); and violation of the New Jersey Consumer Fraud Act by Conduent and HCSC

(Count XVI). Plaintiffs seek, among other relief, monetary damages, nominal damages, statutory damages, restitution, and injunctive relief.

### B. Commencement of the Action, Investigation into the Class Claims, Appointment of Plaintiffs' Interim Class Counsel, and Filing of Consolidated Complaints

15. On October 27, 2025, a class action captioned *Erin Adams-Griffin v. Conduent Business Services, LLC*, No. 2:25-cv-16953, was filed in this District. Plaintiff Adams-Griffin asserted claims against Conduent, individually and on behalf of a nationwide class, each arising from the Data Incident arising from the Data Incident. *See generally* ECF No. 1.

16. Related actions were filed in rapid succession over the next month. *See* ECF No. 11 at n.1. Those related actions also alleged Data Incident impacted Private Information associated with Conduent's clients, including Health Care Service Corporation and American International Group, Inc., both of which were named as co-defendants in some of the related actions. *Id.* at 1.

17. To avoid extended motion practice under either 28 U.S.C. § 1404 or 28 U.S.C. § 1407, and the inevitable impact on the timely prosecution of the action, Class Counsel cooperatively worked with lawyers around the country who had filed cases against Conduent to reach a consensus on prosecuting the Action in this District. This required dismissals of several actions and transferring others to this District.

18. On November 3, 2025, an Amended Complaint was filed in this Action, which added additional named plaintiffs, added Health Care Service Corporation and American International Group, Inc. as defendants and asserted claims against them, and included additional details relating to the Data Incident, including those relating to the involvement of the threat actor SafePay. ECF No. 6.

19. On November 17, 2025, James Cecchi, on behalf of plaintiffs in the majority of the pending actions, asked the Court to consolidate all pending related cases with the Action and proposed an initial consolidation schedule.

20. The Court ultimately consolidated all related actions on November 24, 2025, and created the master docket for this Action, *In Re Conduent Business Services Data Breach Litigation*, No. 2:25-cv-16953-MEF-MAH. ECF No. 19.

21. Over the course of the next four weeks, James E. Cecchi and Jeff Ostrow worked diligently with all plaintiffs' counsel to come to an agreement on an appropriate and efficient leadership structure under Rule 23(g). The purpose of these negotiations was to first serve the interests of the putative class, and second to avoid the time, expense, and judicial burden attendant to protracted plaintiffs' side leadership fights. Avoiding unnecessary motion practice and the corresponding delay related to multiple parties seeking leadership appointments, they were able to achieve almost universal agreement to a consensus proposal. That proposal involved including an additional two firms who had subsequently asked to be added to

plaintiffs' leadership team.

22. The Court approved the appointment of Interim Co-Lead Counsel, Settlement Counsel, and Plaintiffs' Steering Committee on December 19, 2025. ECF No. 91. In doing so, the Court appointed attorneys and law firms with extensive experience prosecuting class actions in general, and data security cases in particular.

23. Between those appoints and the filing of the Consolidated Class Action Complaint on March 18, 2026 (ECF No. 136), Class Counsel undertook substantial, coordinated, and complex efforts to investigate and develop a unified litigation strategy for what ultimately became a 264-page Consolidated Class Action Complaint. This work included reviewing and analyzing all filed complaints and prospective actions; identifying, vetting, and communicating with hundreds of prospective named plaintiffs nationwide; consulting with liability and damage experts; evaluating standing, injury, typicality, and adequacy considerations; determining the appropriate litigation structure, including the hub-and-spoke nature of the data-sharing relationships among Conduent and its consumer facing insurer clients; investigating the relationship between Conduent and each Conduent Defendant Client; coordinating numerous plaintiffs' firms efforts to represent the putative classes; collecting and reviewing data-breach notices, regulatory filings, public reports, insurer disclosures, corporate statements, SEC filings, and cybersecurity publications; researching the SafePay ransomware attack, the scope of

the Data Incident, the categories of information compromised, and the evolving victim counts; analyzing potential state and federal causes of action; identifying applicable state-law subclasses and representative plaintiffs; drafting, revising, and harmonizing allegations originating from numerous constituent complaints; and developing a cohesive pleading strategy designed to maximize recovery. All of that work culminated in the Consolidated Class Action Complaint that required multiple rounds of drafting and revision.

24. Between the filing of the Consolidated Class Action Complaint on March 18, 2026, (ECF No. 136) and the filing of the Amended Consolidated Class Action Complaint on June 12, 2026 (ECF No. 157), Class Counsel continued to investigate the facts and legal issues, and ultimately amended the operative pleading to remove California Physicians' Service d/b/a Blue Shield of California as a defendant and replace American International Group, Inc. with American International Group Procurement Services, Inc. as the named defendant. Amendments were also made to conform the allegations, claims, subclass allegations, plaintiff assignments, and defined terms throughout the complaint to reflect those party changes.

### C. Plaintiffs' Discovery Efforts and Expert Work

25. Shortly after the Action began, Class Counsel actively prepared for discovery and commenced work with their focus on class certification and an

eventual trial. For example, Class Counsel prepared 90 Requests for Production and 25 Interrogatories to Defendant Conduent, as well as 55 Requests for Production and 25 Interrogatories to each Conduent Defendant Client. Public records requests were made to government agencies about the Data Incident, leading to conferences with them regarding their responses, and reviewing public records they produced. Class Counsel also prepared and proposed a Confidentiality Order and an ESI Protocol, which was circulated to Defendants for review on May 20, 2026.

26. At the same time, Class Counsel engaged and worked continuously with their liability and damages experts. These experts included a former federal law enforcement officer experienced in cybercrime that assisted Class Counsel in understanding the nature and scope of the Data Incident, as well as SafePay's background and history of cybercrime. Liability experts were engaged to begin evaluating Defendants acts and omissions that lead to the Data Incident. Class Counsel also engaged the necessary damages experts, including an analysis that would support a calculation of damages based on the value of the compromised Private Information, and a separate damages analysis of damages based on future and continued monitoring costs.

27. To efficiently chart the course for discovery and coalesce around a strategy to pursue the litigation, Class Counsel, the Steering Committee, and other plaintiffs' counsel met weekly by Zoom. They met in person on three occasions in

New York and New Jersey to coordinate various litigation activities and had several discussions with Conduent's counsel to discuss the litigation and prospect of resolution. Plaintiffs' experts joined meetings as needed, and Class Counsel was prepared to fully litigate the Action at the time of Settlement.

### D. The Parties' Extensive Pre-Mediation Efforts

28. Before the filing of the Consolidated Class Action Complaint, Class Counsel actively worked with Conduent and the Conduent Defendant Clients to address procedural and merits issues relating to Plaintiffs' claims. For example, Class Counsel consulted with several of the Conduent Defendant Clients regarding their relationships with Conduent, and whether they had indemnification agreements that would weigh on the potential resolution of the Action.

29. Similarly, Class Counsel engaged in over a dozen calls with Conduent's counsel to understand Conduent's perspective on the litigation, Conduent's relationship with the Conduent Defendant Clients, Conduent's available insurance, and Conduent's present and prospective financial conditions. Class counsel evaluated the prospect of the indemnification claims from the Conduent Defendant Clients against Conduent as well as Conduent's financial statements in publicly reported SEC filings as significant factors weighing on any efforts to resolve the litigation.

30. Given Conduent's publicly stated financial condition, Class Counsel

pursued a comprehensive examination of Conduent's ability to pay a judgment in this case. First, Class Counsel undertook an extensive analysis of Conduent's securities filings to understand its cash position, its role and position in the market for its services, and prospects for the future. Second, Class Counsel engaged a business valuation expert who examined Conduent's public filings and conducted a more complex investigation of Conduent's access to capital, how Conduent was leveraged, and the risk of any Chapter 7 or 11 proceedings in the event of a significant judgment.

31. During this period, Class Counsel continued to research and prepare to respond to Conduent's and the Conduent Defendant Clients' anticipated motions to dismiss. As Defendants' deadline to move to dismiss approached, the Parties agreed to mediate. Importantly, the parties agreed to postpone the operative motion deadlines primarily to preserve funds available under Conduent's insurance policies.

32. As a result of these discussions, a mediation was scheduled on August 13, 2026, in Philadelphia, before experienced data breach class action mediator United States Magistrate Judge, Hon. Diane Welsh. While the mediation formally involved only Conduent and Plaintiffs, the mediation was intended to explore a comprehensive resolution of the entire case, including the potential resolution of all claims against all Defendants, including the Conduent Defendant Clients.

33. The mediation was conditioned on Conduent providing key information

that would allow Class Counsel to make an informed analysis of any proposed settlement. Specifically, Plaintiffs requested detailed information from Conduent including: (a) its insurance tower; (b) its internal investigation into the root cause of the Data Incident; (c) a granular breakdown of the type of data exfiltrated; (d) the domicile and size of the putative class; (e) Conduent's financial condition and ability to pay; and (f) the Conduent's clients interaction and oversight of Conduent's data security practices.

34. Prior to the mediation Conduent responded to these requests as well as numerous others, which allowed Class Counsel to meaningfully approach the mediation with sufficient information to value the claims asserted and the risks of continuing litigation against Conduent and the Conduent Defendant Clients.

35. To assist with analyzing the discovery received from Conduent, and in preparation for mediation, Plaintiffs re-engaged with their expert consultants to examine Conduent's financial disclosures and determine the extent to which Conduent had failed to comply with existing regulatory schemes and the impact of those acts and omissions on the breach itself. Class Counsel also consulted with its business valuation expert and developed a detailed understanding of Conduent's ongoing operations and, specifically, its ability to withstand a significant judgment in this action. This work directly informed and guided Class Counsel's mediation efforts.

36. At the same time, Conduent requested information from the representative Plaintiffs to inform its mediation efforts. Specifically, Conduent served 13 specific requests on Plaintiffs, and Plaintiffs provided written responses and produced documents on August 5, 2026. Plaintiffs' written responses totaled 74 pages, and Plaintiffs' document production totaled 269 pages.

37. To provide comprehensive written responses and produce documents for the Plaintiffs, Class Counsel had to coordinate with relationship counsel representing individual Plaintiffs, develop a uniform strategy for drafting responses and collecting documents, gather and review information from numerous Plaintiffs, prepare each set of written responses and documents for production, and revise and finalize all responses and productions to ensure consistency, accuracy, and conformity.

38. While engaging in this pre-mediation discovery, Class Counsel also devoted substantial time to preparing a detailed mediation brief designed to present Plaintiffs' claims in the best possible light and maximize recovery for the putative class. Preparing the brief required extensive legal research concerning Conduent's and the Conduent Defendant Clients' anticipated motions to dismiss and other defenses; factual investigation into the circumstances of the Data Incident, Conduent's and the Conduent Defendant Clients' cybersecurity practices, and Conduent's and the Conduent Defendant Clients' delayed notification efforts;

review of comparable data-breach settlements, class-certification decisions, and dispositive rulings; analysis of liability, class-certification, and damages issues. Class Counsel also worked closely with their retained expert consultants to respond to issues concerning liability, damages, and the risk of continuing harm to individuals impacted by the Data Incident.

39. In advance of mediation, Plaintiffs served their 22-page mediation brief with 306 pages of exhibits on Conduent. Likewise, Conduent served its 21-page mediation brief with 25 pages of exhibits. Class Counsel closely analyzed Conduent's mediation brief, along with Conduent's pre-mediation discovery responses, in advance of the mediation.

## III. MEDIATION, SETTLEMENT NEGOTATIONS, AND TERMS OF THE SETTLEMENT

40. The Parties participated in an all-day mediation on August 13, 2026 with Judge Welsh. The proposed Settlement was reached only after extensive, arms' length negotiations, detailed analysis and understanding of the underlying claims and defenses at issue. These negotiations were difficult, adversarial, and vigorously executed by both sides. For its part, Conduent is represented by highly sophisticated counsel with extensive experience in data breach litigation. There is no evidence that any collusion or illegality existed during settlement negotiations.

41. The mediation did not occur in a factual vacuum. To the contrary, given the parties' extensive pre-mediation work and experience, all parties were fully

equipped to assess the strengths and weaknesses of their respective positions and meaningfully engage in settlement negotiations. Class Counsel analyzed the information produced by Conduent, evaluated Plaintiff-specific information and documents produced in response to Conduent's requests, assessed litigation and class-certification risks, had a detailed understanding of Conduent's financial condition, and ultimately used that information to formulate Plaintiffs' settlement positions and mediation strategy.

42. Importantly, the mediation was not simply an exercise in exchanging numbers or proposals. Rather, each side made extensive presentations to each other, including client representatives, and, most importantly, Conduent provided additional information regarding the Data Incident, including an extensive presentation and documentary evidence detailing the Data Incident, its investigation, the notification process, and additional financial information, all to allow Class Counsel to further understand the claims and defenses at issue and the risks attendant to further litigation. As a result, the Parties engaged in mediation with information sufficient to permit an informed evaluation of liability, damages, and potential class-wide relief.

43. At the conclusion of mediation, the parties accepted Judge Welsh's mediator's proposal to resolve the Action for an $80,000,000.00 all cash non-reversionary common-fund and Conduent's commitment for improved data security.

44. After mediation, Class Counsel enacted a competitive bid process to obtain proposals from prospective settlement administrators to handle notice and claims administration. Class Counsel received and analyzed proposals for four administrators, including a proposal from CyEx, Inc., a well-established credit and medical data monitoring vendor.

45. Over the following weeks, the Parties' counsel negotiated and drafted the Settlement terms, Notice Program, and Claim Process. They drafted and prepared the Settlement Agreement, worked with the chosen settlement administrator to prepare the Notices and Claim Form, and prepared the proposed Preliminary Approval Order and Final Approval Order. *Id.* After finalizing the Settlement Agreement, the Parties executed it on October 16, 2026. Class Counsel prepared the Motion for Preliminary Approval.

## IV. RISKS OF CONTINUED LITIGATION

46. Plaintiffs and Class Counsel understand this Action is at an early stage: Defendants have not yet filed any motions to dismiss, and the sufficiency of Plaintiffs' alleged claims have not yet been tested by motion. While Plaintiffs and Class Counsel are confident in their ability to assert and prove the class claims, they also appreciate the risks of continuing this litigation. The most significant risk of continued litigation (discussed in detail below) is Conduent's financial condition. Ultimately, consideration of the risks and complexities of the class claims informed

Plaintiffs' conclusion that the benefits of a settlement now—without any further delay and expense—outweigh the risks of continued litigation.

**A. Conduent's Financial Condition**

47. Continued litigation against Conduent is likely to present meaningful collection and enforcement risks. Conduent's financial condition was thus a significant settlement consideration for Plaintiffs and Class Counsel.

48. Conduent was formed in 2017 after Xerox Corporation divested Conduent's previous incarnation, Affiliated Computer Services. ECF No. 157 ¶ 68. Historically, Conduent reported generating annual revenues between $3 and 6 billion. *Id.*

49. Recently, however, Conduent's financial condition has deteriorated significantly. In 2026, Conduent reported double-digit year-over-year revenue declines, substantial losses, and significant debt obligations.[2] Conduent implemented a broad restructuring initiative in 2026 designed to reduce costs and improve profitability, including by selling its Transit and Tolling businesses, in an effort to "reduce debt and further strengthen [Conduent's] balance sheet."[3] Revenue from continuing operations fell to $531 million in Q2 2026, and Conduent reported

[2] *See* https://www.news.conduent.com/news/conduent-reports-second-quarter-2026-results-and-advances-transformation-priorities.
[3] *Id.*

a $57 million pre-tax loss from continuing operations.[4] The Settlement Fund is greater than Conduent's earnings in the past three years, by *double* that amount. Moreover, the Settlement Fund represents approximately one-third of Conduent's *total company value*.

50. Against this backdrop, Plaintiffs and Class Counsel weighed the practical risks associated with continued litigation against a company that is managing substantial debt and ongoing operating losses and implementing significant restructuring efforts with the benefits of a prompt settlement. Continued litigation would require years of additional proceedings, including motions to dismiss, fact and expert discovery, class-certification proceedings, summary judgment practice, trial, and likely appeals along the way. Such a long process creates a substantial risk that Conduent's financial condition will further deteriorate, or that additional restructuring activities could impair Plaintiffs' ability to meaningfully recover anything for their claims.

51. As a condition of the Settlement, and to confirm the publicly available information described above, Conduent provided Plaintiffs and Class Counsel with confidential confirmatory discovery regarding its financial condition. Class Counsel reviewed and analyzed that confirmatory financial discovery, which recognized substantial negative operating cash flows over the preceding two and a half years, a

[4] *Id.*

revolving credit facility that is nearly fully drawn, a near-term debt-repayment obligation, and a substantial accumulated deficit. Overall, all the information obtained by Class Counsel corroborates with Class Counsel's own analysis that Conduent has serious liquidity, leverage, and operating-loss pressures.

52. Plaintiffs and Class Counsel also have a full understanding of the insurance available to Conduent in connection with this Action. Because the relevant policies cover not only Conduent's liability and legal fees, but also potential indemnification claims, which could include Conduent Defendant Clients' legal fees, further litigation would only erode the policies and result in less money available to the Settlement Class.

53. In light of these risks, Plaintiffs and Class Counsel concluded the Settlement secures a substantial, immediate, and certain recovery for the Settlement Class while avoiding the significant risk that continued litigation could result in a judgment that is delayed, materially reduced, or ultimately uncollectible due to further deterioration in Conduent's financial condition and erosion of its available insurance.

**B. Risk in Establishing the Conduent Defendant Clients' Liability**

54. Continued litigation also presents substantial risks with respect to establishing liability against the Conduent Defendant Clients. Unlike Conduent, which operated the systems allegedly compromised in the Data Incident, Plaintiffs

would expect the Conduent Defendant Clients to contend that they neither owned nor controlled the affected data environment, had no way of discovering the cybersecurity infirmities leading to the Data Incident, and therefore cannot be held responsible for the alleged cybersecurity deficiencies that permitted the Data Incident.

55. Similarly, Plaintiff would expect the Conduent Defendant Clients to argue that, to the extent they had any duty to Plaintiffs, they exercised reasonable care in overseeing Conduent, that responsibility for any alleged security failures rests exclusively with Conduent, and that Plaintiffs cannot establish causation because the Data Incident occurred within Conduent's systems and was the result of a security flaw(s) that could not have been discovered with the exercise of reasonable diligence by the Conduent Defendant Clients. In the mediation, the Parties exchanged information reflecting that those defendants had exercised at least sufficient diligence such that the issue would certainly be one for a jury to ultimately adjudicate.

56. Establishing liability against the Conduent Defendant Clients would require substantial fact and expert discovery concerning each of the Conduent Defendant Client's cybersecurity practices, vendor-management procedures, contractual relationships, state-specific statutory and regulatory obligations, and the proper allocation of responsibility between Conduent and the various Conduent

Defendant Clients. Defendants would be expected to devote substantial effort to allocating fault among Conduent, the Conduent Defendant Clients, and other potentially responsible entities. Even if Plaintiffs were to establish wrongdoing by one or more defendants, disputes regarding the allocation of fault could materially reduce or delay, delay, or complicate any recovery obtained for the Settlement Class.

57. Continued litigation would also require Plaintiffs to overcome anticipated challenges concerning standing, injury, causation, class certification, and damages, as well as insurer-specific defenses under the laws of numerous states. The outcome of those issues remains uncertain and could substantially reduce or eliminate any recovery against one or more of the Conduent Defendant Clients.

58. Moreover, because Plaintiffs' claims involve numerous Conduent Defendant Clients operating in different jurisdictions and under different contractual arrangements, liability, causation, and class-certification issues would likely require individualized analysis as to each Conduent Defendant Client, further increasing the complexity, expense, duration, and risks of continued litigation.

59. Plaintiffs and Class Counsel believe strongly in the merits of Plaintiffs' claims against the Conduent Defendant Clients based on, among other things, the Conduent Defendant Clients' collection and maintenance of Class Members' Private Information, their decisions to entrust that information to Conduent, and their obligations to exercise reasonable oversight over Conduent, including those arising

under applicable statutes and regulations, the parties' contracts, the parties' privacy policies, and common law. Nonetheless, establishing these theories would require substantial additional discovery and motion practice for numerous defendants. Along the way, Conduent Defendant Clients' increased costs with the prospect of Conduent's indemnity obligations could further erode Conduent's insurance, reducing the resources Conduent itself could pay for a settlement or judgment.

60. Given these risks, Plaintiffs and Class Counsel concluded the Settlement provides meaningful and immediate relief to the Settlement Class while avoiding the substantial uncertainty, delay, expense, and litigation risk associated with continued efforts to establish liability against the Conduent Defendant Clients, which efforts may have ultimately resolved no recovery.

**C. Other Risks Inherent in Continued Litigation**

61. At the time the Settlement was reached, none of the defendants had yet filed a motion to dismiss and the Court had not yet evaluated the sufficiency of Plaintiffs' claims. Accordingly, Plaintiffs faced the substantial risk that one or all claims, causes of action, classes, or categories of relief could be narrowed or dismissed through motions practice. While Plaintiffs and Class Counsel believe strongly in the merits of Plaintiffs' claims, the outcome of any motion to dismiss proceedings cannot be predicted with certainty, particularly given the number of Defendants, the variety of legal theories asserted, and the evolving nature of data

breach jurisprudence.

62. If the Action were to continue, Conduent and Conduent Defendant Clients are expected to vigorously contest liability, damages, causation, class certification, and the availability of relief at every stage of these proceedings. Resolution of those issues would require extensive fact discovery and motion practice.

63. Continued litigation would also require extensive expert discovery concerning cybersecurity practices, the cause and scope of the Incident, the reasonableness of the cybersecurity measures, industry standards, the value of the allegedly compromised Private Information, and classwide damages. Defendants would present competing liability and damages experts concerning each of these issues, creating additional uncertainty, expense, and litigation risk.

64. Further, because the proposed Settlement Class includes individuals residing in numerous states, continued litigation would also involve complex choice-of-law questions, state-specific defenses, and disputes regarding the applicability of various state statutes and common-law doctrines. Resolution of those issues could narrow the scope of recoverable claims or available relief or defeat class certification entirely.

65. Even if Plaintiffs ultimately prevailed at every stage of the litigation, any recovery would be delayed for years while the Parties litigated motions to

dismiss, class certification, fact and expert discovery, summary judgment, trial, and the certainty of appeals. Such efforts would deplete any applicable insurance coverage and potentially push Conduent to Chapter 7 or 11 bankruptcy given its precarious financial condition. The Settlement avoids those delays and eliminates uncertainty while providing meaningful relief to Settlement Class Members now.

66. In light of these risks, Plaintiffs and Class Counsel concluded that the Settlement provides meaningful and immediate relief to the Settlement Class while avoiding the substantial delay, expense, uncertainty, and litigation risk associated with continued litigation through motions practice, class-certification proceedings, fact and expert discovery, trial, and eventual appeals.

## V. THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

67. Based on Class Counsel's investigation, review of publicly available information and information exchanged through pre-mediation discovery, evaluation of the risks associated with continued litigation, analysis of the strengths and weaknesses of the claims and defenses, and participation in arm's-length settlement negotiations, the Settlement is fair, reasonable, and adequate.

68. The Settlement was reached only after Class Counsel conducted an extensive investigation and research of the facts and law, prepared detailed discovery requests, engaged in pre-mediation informal discovery, reviewed information produced by Conduent, prepared a comprehensive mediation brief, and participated

in mediation before Judge Welsh, a mediator well-versed in data breach litigation. In short, Class Counsel obtained sufficient information to evaluate the strengths and weaknesses of Plaintiffs' claims and the likelihood, timing, and potential amount of any recovery prior to the Settlement. Based on Class Counsel's experience litigating complex data-breach class actions, and considering the substantial risks, uncertainty, delay, and Conduent's financial condition discussed herein, the Settlement represents an excellent result for the Settlement Class, and Class Counsel support approval of the Settlement.

69. Moreover, the Settlement addresses Plaintiffs' key litigation goals. It fairly compensates any Settlement Class Member that suffered an out-of-pocket loss as a result of the Data Incident. It also fairly provides those in Subclass B whose Private Information was stored in files wherein the data was more readily accessible the additional right to a Pro Rata Cash Payment. Providing such relief is equitable.[5] The Settlement also automatically provides all Settlement Class Members access to a high-quality Monitoring product with $1,000,000.00 in identity fraud protection

---

[5] For example, in *In re: AT&T Inc. Customer Data Security Breach Litigation*, No. 3:24-md-03114, ECF No. 534 (N.D. Tex. Oct. 2, 2026), the court finally approved a data breach class action settlement involving approximately 100 million consumers for $177 million. That settlement comprised two classes for two data breaches – one class where $149M was allocated to those individuals whose sensitive data (i.e., SSNs) was exposed, and $28M to the other class where less sensitive data was exposed. Similar relief was approved for two classes with differing data in two data breaches in *In re MGM Int'l Resorts Data Breach Litig.*, Case Nos. 2:20-cv-00376-GMN, 2:23-cv-01480-GMN, ECF No. 262 (D. Nev. June 18, 2025).

without the need to make a claim, providing future protection. Coupled with Conduent's business practice commitments, the Settlement fairly addresses Plaintiffs' litigation goals and secures maximum relief sooner, when the Settlement will have the most impact.

70. Class Counsel recognizes that, because the Settlement Class is exceptionally large (approximately 62 million individuals), the estimated recovery per class member may appear modest when viewed in isolation. However, that result is not atypical in large-scale data breach litigation. A comparison of other Court-approved data breach settlements demonstrates this Settlement is not out of step with other settlements of similar size, involving millions of class members where the average recovery per class member is relatively modest due to the size of the affected population,[6] the uncertainties associated with proving liability and damages, and the substantial litigation risks.

71. The fairness of a class settlement cannot be determined through a simple division of the settlement fund by the total number of settlement class

---

[6] *See, e.g., Adkins v. Facebook, Inc.*, No. 18-cv-05982, 2020 WL 6710086, at *2-3 (N.D. Cal. Nov. 15, 2020) (approving data breach settlement providing only injunctive relief for up to 29 million class members); *Desue v. 20/20 Eye Care Network, Inc.*, No. 21-CIV-61275-RAR, 2023 WL 4420348 (S.D. Fla. July 8, 2023) (granting final approval of $3,000,000 settlement fund for approximately 3,976,023 individuals or $.75 per class member); *Crowe, et al. v. Managed Care of North America*, Inc., et al., Case No. 23-cv-61065-AHS (S.D. Fla.) (providing two years of medical data monitoring and cash for documented losses as settlement benefits for approximately 8.9 million class members).

members. Rather, a settlement must be evaluated in light of the strength of the claims, the risks of continued litigation, the likelihood of class certification, the risks associated with proving liability and damages, the collectability of any judgment, and the delay and expense associated with continued litigation. Here, the Settlement was reached before any motion to dismiss was filed, before class certification proceedings, and before the Parties incurred the substantial expense associated with full fact and expert discovery, summary judgment practice, trial, and appeals.

## VI. FACTS SUPPORTING SETTLEMENT CLASS CERTIFICATION

72. The Settlement Class is numerous because its definition encompasses approximately 62 million Settlement Class Members, the joinder of whom in one action would certainly be impracticable.

73. Numerous common issues exist. For example, Conduent's data security safeguards were common across Settlement Class Members, and those safeguards applied to one Settlement Class Member's Private Information did not differ from the rest of the Settlement Class. This and other common questions alleged in the Consolidated Complaint are central to the claims, will generate common answers, and can be addressed on a class-wide basis.

74. Plaintiffs' and Settlement Class Members' claims all stem from the same event—the Data Incident. Moreover, all claims implicate Conduent's organization-wide cybersecurity practices and course of conduct, which necessarily

applied uniformly across all Plaintiffs and Settlement Class Members.

75. The Plaintiffs have no interests adverse or antagonistic to absent Settlement Class Members. Plaintiffs are all individuals whose Private Information may have been impacted by the Data Incident and who allege that Conduent and its clients were negligent in allowing the Data Incident to occur. Moreover, the representative Plaintiffs have all been actively engaged in the litigation and, in preparation for mediation, responded to informal discovery requests, and have remained involved during the settlement process. They have amply fulfilled their duties to all absent class members.

76. The answers to the key questions in this Action are not tangential or theoretical such that the Action will not be advanced by certification. Rather, they go to the core of the controversy. The answers will be the same for each Settlement Class Member in that their Private Information was impacted in the Data Incident. Common factual and legal questions predominate based on Conduent's alleged failure to safeguard all Settlement Class Members' Private Information from unauthorized access during the Data Incident.

77. Settlement Class Members do not have a strong interest in controlling the prosecution of this case. After all, it would cost them substantially more to litigate an individual case than they could recover in damages. Thus, a class action is superior to individual litigation.

78. Finally, there is a reliable, administratively feasible method to identify almost the entire Settlement Class and, in fact, Conduent and the Conduent Defendant Clients have already made this determination when they sent out breach notices to the approximately 62 million Settlement Class Members. The Settlement Administrator will be provided with the Class List and send out Notice to all Settlement Class Members with a link to a Claim Form.

## VII. SETTLEMENT ADMINISTRATION, NOTICE PROGRAM, AND CLAIM PROCESS

79. Following mediation, Class Counsel devoted time to develop the proposed Notice Program and Claim Process with Conduent's Counsel and the proposed Settlement Administrator.

80. Class Counsel began by issuing a request for proposals from several settlement administrators, responded to numerous inquiries regarding the requests, and carefully considered each response. After vetting each applicant, and subject to Court approval, Class Counsel has retained Epiq Class Action & Claims Solutions, Inc. to serve as the Settlement Administrator.

81. Epiq is a nationally recognized administrator with extensive experience administering large and complex data-breach and privacy class action settlements, and Class Counsel selected Epiq based on its experience, administrative capabilities, and cost-effectiveness. Class Counsel have all worked with Epiq in many cases. Epiq has confirmed it will operate consistent with Class Counsel's and this Court's

expectations, and has affirmed its fiduciary duty to all Settlement Class Members. All Settlement Administration Costs will be paid from the Settlement Fund, and the Parties will jointly oversee the Settlement Administrator's work.

82. The proposed Notice Program uses direct Email Notice and Reminder Email Notice as its primary method. Because Conduent does not maintain email addresses for Settlement Class Members, Conduent will make reasonable efforts to obtain Class Member contact information from Conduent's clients and will provide the resulting Class List to the Settlement Administrator. The Settlement Administrator will take industry acceptable measures to reach Settlement Class Members for whom email addresses are not available in the Class List. These steps include research by the Settlement Administrator to locate email addresses through the use of other information provided in the Class List. Publication Notice will also be used to provide awareness to Settlement Class Members who do not receive direct Notice. The Settlement Administrator will also establish and maintain a Settlement Website hosting the Long Form Notice, the Claim Form, and other key documents, and a toll-free telephone line to answer Settlement Class Member inquiries. Settlement Class Members may also request the Long Form Notice and Claim Form from the Settlement Administrator. The Settlement Administrator will complete the Notice Program no later than 45 days before the initial Final Approval Hearing.

83. The Settlement Administrator will also serve the notice required by the

Class Action Fairness Act, 28 U.S.C. § 1715, on the appropriate state and federal officials no later than 10 days after the Settlement Agreement is filed with the Court.

84. The Notice Program and the forms of Notice are designed to apprise Settlement Class Members of the material terms of the Settlement, the benefits available and how to claim them, the Monitoring activation code, and the deadlines and procedures for submitting a Claim, opting out, or objecting. The Notices also comply with the Fed. R. Civ. P. 23(h) by notifying Settlement Class Members of the amount of attorneys' fees that Class Counsel will seek, along with the reimbursement of litigation costs.

85. The Claim Form Deadline is 15 days before the initial scheduled Final Approval Hearing, and the Opt-Out Deadline and Objection Deadline are both 30 days before the initial scheduled Final Approval Hearing.

86. Class Counsel reviewed and revised the proposed Notice forms and Claim Form prepared by Epiq. Based on this work, Class Counsel believe the proposed Notice Program constitutes the best notice practicable under the circumstances and is reasonably designed to satisfy the requirements of Rule 23 and due process. Class Counsel will also review the Settlement Website pages and interactive voice responses for the toll-free telephone line once the Settlement Administrator prepare them following Preliminary Approval, which bolster the Notice Program. Class Counsel will coordinate with the Settlement Administrator

and Conduent regarding Notice Program and Claim Process implementation.

87. The Claim Process for Cash Payments is straightforward and easy for Settlement Class Members to submit Claims.

## VIII. CLASS COUNSEL'S MOTION FOR ATTORNEYS, FEES, COSTS, AND SERVICE AWARDS

88. Consistent with the Settlement Agreement, the provisions governing Attorneys' Fees and Costs and Service Awards were not negotiated until after the Parties had agreed on all material terms of the Settlement for the benefit of the Settlement Class. The Settlement is not contingent on the Court's approval of any particular award of Attorneys' Fees and Costs or Service Awards; if the Court awards less than the amounts requested, the remaining provisions of the Settlement remain in force, and no portion of the Settlement Fund reverts to Conduent. Any Attorneys' Fees and Costs or Service Awards the Court declines to approve will remain in the Settlement Fund for the benefit of the Settlement Class.

89. The Motion for Attorneys' Fees, Costs, and Service Awards will be filed before the Opt-Out Deadline and Objection Deadline, which will be posted on the Settlement Website. Settlement Class Members will have an opportunity to object and be heard regarding that motion at the Final Approval Hearing. Class Counsel intend to request an award of attorneys' fees of 34% of the Settlement Fund ($27,200,000.00), an amount that is authorized by well-settled law, plus reimbursement of reasonable litigation costs, all to be paid from the Settlement Fund.

90. Class Counsel prosecuted this Action on a wholly contingent basis. Class Counsel devoted attorney time and advanced litigation costs with no assurance of any recovery or compensation, and undertook that risk knowing that data breach class actions present substantial and well-documented hurdles to liability, class certification, and the collection of any judgment. Those risks were compounded here by Conduent's financial condition, which further decreased the likelihood of recovery. Had the litigation been unsuccessful at any stage, Class Counsel would have received nothing and borne their own costs. Indeed, Class Counsel have intensively litigated past cases to conclusion with no recovery and accepted the loss of attorney time and expenses devoted to the litigation. It is the willingness of experienced counsel to accept the risk of non-payment while devoting attorney time and resources that makes it possible for a class of this magnitude to obtain meaningful, immediate relief, and the $80,000,000.00 non-reversionary common-fund recovery reflects the value of that undertaking.

91. This Action has been a substantial and demanding undertaking, necessitating at times an all-hands-on-deck approach. Prosecuting a nationwide data-breach class action against Conduent and multiple Insurer Defendants—involving tens of millions of affected individuals, sophisticated defense counsel, complex questions of liability, causation, and allocation among numerous defendants, expedited confidential and confirmatory discovery, and a hard-fought, full-day

mediation—required Class Counsel to commit significant attorney and staff resources over a compressed period. Because of the scope and intensity of that commitment, Class Counsel were required to forgo or decline other legal work and engagements that they otherwise would have undertaken during the pendency of this Action. Class Counsel will detail the time, resources, and opportunity costs devoted to this matter in connection with the forthcoming Motion for Attorneys' Fees, Costs, and Service Awards.

92. Class Counsel will also request modest Service Awards for the Class Representatives in recognition of their service to the Settlement Class, in an amount not to exceed $1,500.00 each, to be paid from the Settlement Fund. As noted above, the acted to pursue this Action for the benefit of the Settlement Class and participated in informal discovery to aid the settlement process.

We declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: October 16, 2026

*/s/ James E. Cecchi*
James E. Cecchi

*/s/ Jeff Ostrow*
Jeff Ostrow

*/s/ Gary M. Klinger*
Gary M. Klinger

*/s/ Norman E. Siegel*
Norman E. Siegel